AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )  Case No.   20-sw-00237-GPG |
| 227 Red Mesa Heights Road, Grand Junction, CO, more fully described in Attachment A | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment (A) attached hereto and hereby incorporated by reference.

located in the _____ State and _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment (B) attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute |

The application is based on these facts:
See attached affidavit of TFO Blake McClellan

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
s/ Blake McClellan
*Applicant's signature*

_____
Blake McClellan, Task Force Officer
*Printed name and title*

Sworn to and signed by realiable electronic means.

Date:   2/21/20

_____
*Judge's signature*

City and state:  Grand Junction, CO

Gordon P. Gallagher, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Blake McClellan, a Task Force Officer with the Drug Enforcement Administration (DEA), being duly sworn, do hereby depose and state as follows:

## AFFIANT'S BACKGROUND

1.      I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code, and am authorized by law to conduct investigations and make arrests for offenses in Title 18, United States Code, Section 2516.

2.      I am currently employed by the Mesa County Sheriff's Office as an Investigator assigned to the Western Colorado Drug Task Force (WCDTF) and was so at all times relevant to the facts contained herein.  I have been employed as a sworn peace officer for over twenty-one years and was assigned to the WCDTF in November of 2012.  The primary function of the WCDTF is to investigate drug organizations.  In November 2014, I was assigned to the DEA as a federally deputized Task Force Officer.  All of the information herein contained was compiled by me in the course of a criminal investigation, including speaking with fellow law enforcement officers and named citizens.

3.      I have personally written and served numerous search warrants for residences, computers, vehicles, and other items used in the trafficking of controlled substances; written arrest affidavits for persons suspected of trafficking controlled substances; interviewed numerous persons about the use and distribution of controlled substances; written affidavits for the interception of telephonic communication; and completed investigations into money laundering and financial crimes.  As a result of this experience, I am familiar with the ways in which controlled substance traffickers conduct business, including but not limited to, methods of importing, manufacturing and distributing narcotics; methods of laundering the profits gleaned

from the sales of controlled substances; and the use of telephonic devices and other
telecommunications methods to conduct transactions.

4.       Based on my experience, training, and discussions with other law enforcement
officers experienced in drug investigations, I know that certain indicators exist when persons use
residential homes for cultivating marijuana.  Indicators for homes that contain marijuana grows
include, but are not limited to, the following:

a.       Homes used to grow marijuana are outfitted with dozens of high output
lights and ballasts.  These lights create the artificial light that allows the process of
photosynthesis to occur and the marijuana plants to grow.  These lights use large amounts
of electricity each month and can be on for up to 24 hours a day.  The US Energy
Information Administration (EIA) collects and records average household electrical
usage in the United States.  During 2017, the EIA reported the average monthly electrical
usage for Colorado households was 678kw.  I know from training and experience that
typical homes use 500 to 1500kw of electricity per month.  Electrical usage in excess of
1,500kw per month is a very good indicator that the home is being used to grow
marijuana.  There are few reasons that can account for large amounts of electrical
consumption in residential homes, other than the use of high output lights and ballasts
found in marijuana grows.

b.       Many residential marijuana grow homes are not occupied.  The heat and
humidity from the marijuana grow and the use of chemicals make the homes
uncomfortable to be in for long periods of time.  The growers will come to harvest the
marijuana or tend to the marijuana grow every few days.  I know that conducting
surveillance on homes and establishing that they are not being lived in is an indicator

they are used to grow marijuana. This is especially true when seeing elevated levels of

electrical consumption at homes which surveillance has established as being unoccupied,

or only visited infrequently.

      c.    Because many marijuana grow homes are often unoccupied, I know the

homes seldom contain items of evidentiary value other than the marijuana plants and

growing equipment. The marijuana growers know the homes may be the target of law

enforcement search warrants, or robbery and theft. As a result, the growers will often

keep finished marijuana product, money from the illicit sale of marijuana, and documents

related to the criminal enterprise at other locations that do not contain a marijuana grow.

      d.    The odor of marijuana at a home is a good indicator the home is being

used to grow marijuana plants. Many residential marijuana grows will have the strong

odor of marijuana that is easily detected from outside the home. However, I also know

from training and experience that great lengths are taken to construct marijuana grows so

that the odor of marijuana is contained or hidden. This is done by using construction

techniques to seal rooms making them air tight, using large commercial filters to remove

the odor of marijuana, and using timers so the grow is vented when it is less likely to be

detected by neighbors and law enforcement. These methods are often very effective at

preventing the odor of marijuana from being detected outside the home.

5.    During the course of my participation in numerous investigations, I have used a

variety of investigative techniques and resources, including physical and electronic surveillance

and various types of informants and cooperating sources. Because of these investigations,

training and experience, and conversations with other agents and law enforcement personnel, I

have become familiar with the methods used by traffickers to: smuggle and safeguard controlled

substances, distribute controlled substances, and collect and launder the proceeds generated by

their sale, manufacture and distribution.  In addition, I have learned that drug traffickers use

various types of electronic communication devices to code, encrypt, conceal and maintain

records in order to facilitate their trafficking activities.  Through all of this training and

experience I have further learned:

   a. That persons involved in large-scale drug trafficking conceal, in various

locations, caches of drugs, drug paraphernalia, deeds to property, and other items of value

and/or proceeds of drug transactions and evidence of financial transactions relating to

obtaining, transferring, secreting, or spending large sums of money acquired from drug

trafficking activities.

   b. That drug traffickers often maintain (in either physical or electronic

format): negotiable monetary instruments, transaction ledgers, U.S. currency, electronic

currency (Bitcoin, etc.), controlled substance supplier lists, correspondence, drug-related

notations, logs, receipts, journals, books, records, and other documents noting the price,

quantity, and/or times when controlled substances were obtained, transferred, sold,

distributed, and/or concealed.  I have further learned that drug traffickers also maintain

drug paraphernalia such as weighing devices, marijuana cultivation paraphernalia,

miscellaneous containers, and measuring devices, which are used to facilitate the

distribution and/or consumption of controlled substances.

   c. That drug traffickers earn large sums of money and often try to legitimize

these large sums of money.  In order to do this, drug traffickers attempt to secret, transfer,

and conceal the illicit money by 1) placing assets in names other than their own to avoid

detection while maintaining control; 2) hiding the money (and related documents) in

businesses, safes, and associated bank accounts and safe-deposit boxes; 3) using the money to buy assets that are difficult to trace; 4) depositing and commingling drug proceeds with legitimate funds in an effort to conceal the drug proceeds.

d.      That drug traffickers engaged in money laundering frequently retain records of their transactions within their places of business.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, electronic communications and other records.

e.      That drug traffickers engaged in money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

f.      There are many reasons why drug traffickers maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The drug trafficker may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden or further destroyed any computer-related evidence.  However, that evidence may still be retrievable by a trained forensic computer expert.

g.      Net worth / source and application of funds analyses can often show that a suspect's known expenditures and/or accumulation of assets substantially exceeds his or her legitimate sources of income, thus providing evidence that the suspect is engaged in illegal activities (such as drug trafficking or fraud) which result in the generation of monetary proceeds.  The net worth analysis compares a suspect's net worth (cost value of total assets minus total liabilities) at a time just before the suspect has commenced his purported criminal enterprise, with his/her net worth at the approximate time of his/her arrest (and potentially at intervals in the interim).  The source and application of funds analysis focuses on the suspect's expenditures during the time period of the purported illegal activities and compares such expenditures with his/her legitimate sources of income.  Both analyses require evaluation of bank records, credit records, loan records, documents evidencing ownership of assets, and other documents evidencing the financial profile of the suspect during the course of the purported illegal activity, as well as a short time period prior to the illegal activity (e.g., one year).  Such analysis evidences changes in lifestyle, asset accumulation, and expenditures between the time period prior to the illegal activity and the time period of the illegal activity.  This can provide evidence of profit-generating illegal activities (e.g., drug trafficking or fraud), as compared to a person earning income from legitimate sources.  Evidence of a defendant's expenditures, asset accumulation, financial life-style, net worth/source and application of funds analyses, and underlying financial documents necessary for such analyses are admissible evidence under federal case law in drug trafficking and money laundering cases.  This establishes the need for such documents to be taken during the execution of a search warrant.

h.      Drug traffickers are not unlike other members of society in that they rely on credit and debit cards to make financial payments.  Records relating to the use of such cards can provide valuable information to the investigation by establishing the amount of money that is being spent by the suspects, and it may further identify businesses which are associated with the illegal activities of the suspects.

i.      Drug traffickers deal in currency and store currency in conveyances, homes, safe deposit boxes, safes and at business sites to conduct transactions. Furthermore, the Currency Transaction Report (CTR) (IRS Form 4789) is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction that exceeds $10,000.  This requirement causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions because these reports can be made available to law enforcement officials.  It is quite common for individuals who deal in illegal controlled substances to convert drug proceeds (currency) into cashier's checks or money orders in amounts less than $10,000 at numerous financial institutions over the course of several days in order to avoid the CTR filing requirement.  Furthermore, drug traffickers often recruit other individuals to convert drug proceed currency for them in order to avoid handling the currency themselves.  Finally, it is not uncommon for drug traffickers to endeavor to circumvent these requirements and "legitimize" their funds through casinos, documenting their "winnings" in an attempt to show an additional source of income.

j.      Drug traffickers also use financial habits designed to minimize and hide a paper trail.  Traffickers often purchase and/or title their assets in fictitious names, aliases, or in the names of relatives, friends, associates or business entities to avoid detection of

these assets by government agencies, especially the Internal Revenue Service. Regardless of documented ownership, the drug traffickers continue to use these assets and exercise control over them;

k.      Individuals who deal in illegal controlled substances take, or cause to be taken, photographs of themselves, their associates, their property and their illegal product.  These individuals usually maintain these photographs in their possession or in businesses such as dispensaries where they have access and control.  Locations related to the cultivation and distribution of illegal marijuana often maintain surveillance systems to monitor and protect grow sites, which frequently store and maintain evidence of ongoing illegal activity and criminal associations.

l.      Drug traffickers often engage in domestic and/or international travel in relation to the smuggling of illegal contraband.  Specifically, subjects of this investigation are of Chinese decent and engage in interstate or international travel for purposes of obtaining supplies, smuggling bulk currency out of the United States, distributing their product and/or speaking with investors and associates.  Analysis of travel records can reveal other locations related to the distribution of illegal drugs or the payment of related proceeds.  Furthermore, evidence of travel can also assist in the identification of assets and/or monetary expenditures associated with the illegal proceeds of drug transactions.

6.      The information contained within this affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.  Because this affidavit is being submitted for the limited purpose of securing a search warrant, each and every fact known concerning this investigation has not been included. This document contains only the facts believed necessary to establish probable cause that evidence,

fruits and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1), as specified in Attachment B of this affidavit, are located at the TARGET LOCATIONS described in Attachment A of this affidavit.

## FACTS PERTAINING TO PROBABLE CAUSE

7.      In 2019, the DEA began an investigation into the Sang BANG Drug Trafficking Organization.  Through physical surveillance, GPS tracking devices, open records searches, and analyzing electrical consumption records, investigators learned Sang BANG and his wife, Qiong Qiong LIN, were operating marijuana grows at 227 Red Mesa Heights Road, Grand Junction, Colorado (TARGET LOCATION ONE); 571 ½ Villa Street, Grand Junction, Colorado (TARGET LOCATION TWO); 2734 Patterson Road, Grand Junction, Colorado (TARGET LOCATION THREE); and 140 Lands Down Road, Grand Junction, Colorado (TARGET LOCATION FOUR).  BANG and LIN's primary residence is 3156 Arrowhead Drive, Grand Junction, Colorado (TARGET LOCATION FIVE).  As documented below, BANG and LIN frequently go to each of these locations, where there is probable cause to believe they tend to the marijuana plants.

### TARGET LOCATIONS

8.      TARGET LOCATION ONE.  227 Red Mesa Heights Road, Grand Junction, Colorado, is a single family residence in a neighborhood.  Mesa County Assessor records list the owner as Qiong LIN and Sang BANG.  Xcel Energy provides electrical service to this address. The Xcel Energy account holder for 227 Red Mesa Heights Road is Sang BANG.  BANG has been the account holder since June 2018.  Records from Xcel Energy for the December 2019 to January 13, 2020, billing cycle show 227 Red Mesa Heights Road used 15,804kw of electricity. Between July 2019, and January 2020, the average monthly electrical usage at 227 Red Mesa

Heights Road was 12,000kw.  Based on my training and experience, this means 227 Red Mesa Heights Road is using on average, 12 times more electricity than a comparable sized home. Based on the elevated electrical usage and further information detailed below, I believe 227 Red Mesa Heights Road has been and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

9.     TARGET LOCATION TWO.  571 ½ Villa Street, Grand Junction, Colorado, is a single family residence in a neighborhood.  Mesa County Assessor records list the owner as Ping Zhang.  Zhang has not been identified as a subject observed at this location and could be a witting or unwitting owner.  Xcel Energy provides electrical service to this address.  The Xcel Energy account holder for 571 ½ Villa Street is Qiong LIN.  LIN has been the account holder since March 2017.  Records from Xcel Energy for the December 2019 to January 2020 billing cycle show 571 ½ Villa Street used 8,383kw of electricity.  Between July 2019 and January 2020 the average monthly electrical usage at 571 ½ Villa Street was 7,000kw.  Based on my training and experience, this means 571 ½ Villa Street is using on average, seven times more electricity than a comparable sized home.  Based on the elevated electrical usage and further information detailed below, I believe 571 ½ Villa Street has been and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

10.     TARGET LOCATION THREE.  2734 Patterson Road, Grand Junction, Colorado, is a single family residence in a neighborhood.  Mesa County Assessor records list the owner as Lin Yang.  Yang has not been identified as a subject observed at this location and could be a witting or unwitting owner.  Xcel Energy provides electrical service to this address.  The Xcel Energy account holder for 2734 Patterson Road is Sang BANG.  BANG has been the account holder since September 2019.

a.       Prior to BANG becoming the electric account holder, 2734 Patterson Road was believed to be a marijuana grow based on high power usage.   In December 2018, the house used 13,348kw.  From my training and experience, I know it is common for the operators of marijuana grow homes to change.  I believe that starting in September of 2019, BANG took over the electrical account at 2734 Patterson Road and is operating it as an illegal marijuana grow.

b.       Records from Xcel Energy for the November to December 2019 billing cycle show 2734 Patterson Road used 18,657kw of electricity.  Between August 2019 and December 2019, the average monthly electrical usage at 2734 Patterson was 13,000kw.  Based on my training and experience, this means 2734 Patterson Road is using on average 13 times more electricity than a comparable sized home.  Based on the elevated electrical usage and further information detailed below, I believe 2734 Patterson Road has been and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

11.     TARGET LOCATION FOUR.  140 Lands Down Road, Grand Junction, Colorado, is a single family residence in a neighborhood.  Mesa County Assessor records list the owner as Brad Dibble.  Dibble is not believed to have any involvement in the suspected marijuana growing operation at this location.  Grand Valley Power provides electrical service to this address.  There are two separate electrical meters at 140 Lands Down Road, one for the residence and one for the detached garage.  The Grand Valley Power account holder for both meters at 140 Lands Down Road is Qiong LIN, listing a billing address of 3156 Arrowhead Drive.  LIN has been the account holder since September 2019.

a.       Since the electrical account was placed into LIN's name in September

2019, a new commercial style HVAC unit has been installed on the roof of the home.  I know from training and experience that additional heating and cooling capacity is often needed to control the temperature inside homes used for the cultivation of marijuana.

        b.     The shop meter at this location was installed in September 2019, when LIN became the account holder.  Records from Grand Valley Power for the November 2019 billing cycle show the residential meter at 140 Lands Down Road used 14,869kw of electricity.  During this same billing cycle, the shop meter at 140 Lands Down Road used 8,359kw.  Once LIN became the account holder in September 2019, the electrical usage has steadily increased.  The residential meter used 425kw in September 2019, 4,384kw in October 2019 and 14,869kw in December 2019.  The shop meter used 3,530kw in September 2019, 10,593kw in October 2019, and 8,359kw in November 2019.  Based on the elevated electrical usage and further information detailed below, I believe 140 Lands Down Road has been and continues to be utilized to cultivate marijuana in violation of Title 21, United States Code, Section 841(a)(1).

    12.     TARGET LOCATION FIVE.  3156 Arrowhead Drive, Grand Junction, Colorado, is a single family residence in a neighborhood.  Mesa County Assessor records list the owner as Sang BANG and Qiong Qiong LIN.  Xcel Energy provides electrical service to this address.  The Xcel Energy account holder for 3156 Arrowhead Drive is Sang BANG.  Electrical consumption (417kw) is within the normal range at this location and 3156 Arrowhead Drive is not suspected of being a marijuana grow.  Based on surveillance and GPS tracker data, it is the primary residence of BANG and LIN.  Based on the information below, I believe 3156 Arrowhead Drive likely contains evidence related to the illegal cultivation of marijuana occurring at TARGET LOCATIONS ONE through FOUR in violation of Title 21, United States Code, Section

841(a)(1).

### SURVEILLANCE AT TARGET LOCATIONS:

13.     Agents installed a pole camera, on public land, observing the driveway and side

door of TARGET LOCATION ONE.  On July 8, 2019, DEA Special Agent (SA) Koontz was

watching this pole camera and observed a white Toyota Sienna minivan (Colorado CFF718) pull

into the driveway.  The minivan is registered to Sang BANG at TARGET LOCATION FIVE.

A male, whom SA Koontz recognized as Sang BANG from a Colorado driver's license photo

and prior surveillance, unloaded several plants from the minivan into TARGET LOCATION

ONE.  Based on her training and experience, SA Koontz recognized these plants as marijuana

plants.

14.     On September 4, 2019, CBI Agents Tifft and Peck, and DEA SA Koontz were

conducting surveillance at TARGET LOCATION FIVE.

      a.     Parked in the driveway was BANG's white Toyota Sienna minivan

(Colorado CFF718).  Investigators observed an Asian male moving unknown items from

TARGET LOCATION FIVE into the white Toyota minivan.

      b.     During this surveillance, a silver Toyota Sienna minivan (Colorado

KQT096, registered to Sang BANG and Qiong LIN) left the garage of TARGET

LOCATION FIVE.  The minivan was followed to 259 31 Road.  The property was listed

for sale and it appeared the occupants of the minivan met with a realtor who showed them

the property.

      c.     After leaving 259 31 Road, the minivan drove to TARGET LOCATION

FOUR.  Agent Tifft identified the driver of the minivan as Qiong LIN from her Colorado

driver's license photo.  LIN met with several men who were doing landscaping outside

140 Lands Down Road.  The landscapers were in the process of building a fence around the property.  The minivan stayed at 140 Lands Down Road for about 15 minutes before driving back to TARGET LOCATION FIVE.

       d.      In this incident, I believe LIN was looking at acquiring a new property for the DTO to use as a marijuana grow.  LIN then went to TARGET LOCATION FOUR, which had recently been acquired by the DTO, and was checking on the work being done to the residence.

       2.      Once LIN arrived back at TARGET LOCATION FIVE, investigators noted the white Toyota Sienna minivan (Colorado CFF718) was still parked in the driveway.

       a.      SA Koontz observed a male load a black trash bag from TARGET LOCATION FIVE into the white Toyota Sienna minivan (Colorado CFF718).  The minivan left TARGET LOCATION FIVE and was followed to the suspected marijuana grow at TARGET LOCATION TWO where it stopped briefly.  The minivan then drove back to TARGET LOCATION FIVE and again, stopped briefly.  Investigators were not able to see if any items were moved between the Toyota minivan and either residence.

       b.      After leaving TARGET LOCATION FIVE, the white Toyota minivan (Colorado CFF718) drove back to TARGET LOCATION TWO, where it pulled into the garage.  The minivan stayed in the garage for about an hour, and then left and drove directly to the Mesa County Landfill.  A male, who Agent Tifft recognized as Sang BANG from his Colorado driver's license picture, disposed of multiple black trash bags at the landfill.  Agent Tifft examined the contents of the trash bags, which contained cut down marijuana plants and fertilizer containers.

c.      After leaving the landfill, BANG was followed to the suspected marijuana grow at TARGET LOCATION ONE.  Pole camera footage showed BANG went inside TARGET LOCATION ONE.

d.      In this incident, I believe marijuana was harvested at TARGET LOCATION TWO.  BANG disposed of the cut down marijuana plants from TARGET LOCATION TWO at the landfill, before traveling to the marijuana grow at TARGET LOCATION ONE.  BANG also moved an unknown object in the Toyota minivan between TARGET LOCATION FIVE and TARGET LOCATIONS ONE and TWO.  BANG moving items between the marijuana grows and his primary residence at TARGET LOCATION FIVE demonstrates TARGET LOCATION FIVE likely contains evidence related to the conspiracy to distribute and cultivate marijuana.

15.     On November 20, 2019, CBI Agent Russell was watching the pole camera at TARGET LOCATION ONE.

a.      BANG's white Toyota Sienna minivan (Colorado CFF718) arrived occupied by an Asian male and female.  From their Colorado driver's license pictures, Agent Russell recognized BANG and LIN as the occupants of the minivan.

b.      BANG and LIN both began unloading potted plants from the minivan and carrying them into TARGET LOCATION ONE.  From his training and experience, Agent Russell recognized these plants as marijuana plants.  It appeared approximately 10-15 marijuana plants were taken into TARGET LOCATION ONE.  BANG and LIN then carried a stack of approximately 10 empty planter pot from TARGET LOCATION ONE to the minivan.  LIN left in the minivan and was followed by investigators to TARGET LOCATION TWO, where she pulled into the garage.

      c.     In this incident, I believe marijuana plants were moved into TARGET LOCATION ONE and then empty planter pots were taken to the suspected marijuana grow at TARGET LOCATION TWO.  It is likely these pots were going to be used for a new marijuana crop at TARGET LOCATION TWO.

16.    On January 8, 2020, surveillance was being conducted at TARGET LOCATION TWO by investigators.

      a.     A garage door repair company was working on the garage door.  A female investigators recognized as Qiong LIN from her Colorado driver's license photo, and an Asian male in a white hat, were at TARGET LOCATION TWO watching the garage door being fixed.  When the door company was finished working on the garage door, LIN and the Asian male left TARGET LOCATION TWO in separate vehicles.  Mesa County Sherriff's Office Deputies stopped the vehicle driven by the Asian male.  Sang BANG was identified as the driver from his Colorado driver's license.  Following the traffic stop, BANG was followed to TARGET LOCATION ONE.

      b.     In this incident, I believe the garage door at TARGET LOCATION TWO had broken.  LIN and BANG arranged for the door to be fixed and were both at the marijuana grow as the door was being repaired.  After the door was repaired, BANG drove to the suspected marijuana grow at TARGET LOCATION ONE.

17.    I reviewed the pole camera covering TARGET LOCATION ONE, previously referenced in paragraph 13, and noted significant activity since January 29, 2020.  I noted, in my review of the activity captured by the pole camera, that the time stamp appeared to be approximately 2 hours off.  I concluded this due to the timing of the sunrise and sunset each day, and compared the timestamp on the live recording to the actual time.  The timestamp on the video is

approximately two hours later (i.e. 1400 hours) than the actual time (i.e. 1200 hours).  All times

referenced under this paragraph 17 are the timestamp on the video.  This camera is set to record

24 hours, but is subject to connectivity loss, occasionally resulting in voids in time.

      a.     On January 29, 2020, at approximately 1223 hours, the white Toyota

Sienna minivan (Colorado CFF718), arrived driven by a male believed to be BANG.  He

backed the van up to the south door and made approximately 12 trips from the van to the

house with potted plants that appeared to be marijuana.  After his last trip into the house

he appeared to be texting on a cell phone.  He left in the van at approximately 1253

hours.  The van and same male returned at approximately 1339 hours, and made

approximately 10 trips from the van to the house with more potted plants that appeared to

be marijuana.  At approximately 1418 hours, he made approximately 24 trips from the

house to the van with large trash bags, all of which were black in color except one white

one.  The van left at approximately 1438 hours.  At approximately 2020 hours what

appeared to be the same van and same male arrived back at the residence.  The male

made approximately nine trips between the van and the house with what appeared to be

more marijuana plants.  The van left at approximately 2046 hours.

      b.     On January 30, 2020, at approximately 1510 hours, the same van and who

appeared to be the same male subject arrived at TARGET LOCATION ONE.  The male

subject made approximately 10 trips from the van to the house with what appeared to be

marijuana plants.  He left at approximately 1731 hours.

      c.     On January 31, 2020, at approximately 1617 hours, the same van arrived

driven by an individual who appeared to be the same male subject, who then loaded

numerous items into the van from the house.  The subject left at approximately 1704

hours.

d.      On February 1, 2020, at approximately 1314 hours, a male subject arrived at TARGET LOCATION ONE.  There was no vehicle in view of the camera.  The male subject pulled the white van into view at approximately 1527 hours, loaded what appeared to be a large black trash bag into the van and left.

e.      On February 3, 2020, at approximately 1316 hours, a male subject arrived with no vehicle in camera view.  At approximately 1340 hours, two females arrived and went inside the residence.   At approximately 1423 hours, the two females left.  At approximately 1522 hours the male subject left with a large black trash bag.

f.      On February 6, 2020, at approximately 1440 hours, a male believed to be BANG arrived in the same white van.  Another unknown male subject arrived at approximately 1447 hours.  At approximately 1453 hours, two females arrived and carried in two large black trash bags.  At approximately 1734 hours, one female left.  At approximately 1838 hours, what appeared to be four children and 1 adult female arrived.  At approximately 2121 hours, it appeared everyone previously observed arriving, left the residence.

g.      On February 7, 2020, the same white van arrived at approximately 1155 hours, with two unknown females.  They made a couple trips from the van, into the residence with what appeared to be marijuana plants.  They also made numerous trips from the residence to the van with large black trash bags.  At approximately 1209 hours, the van left with one female.  The van returned with the one female at approximately 1248 hours.  At approximately 1403 hours, a male believed to be BANG arrived.  The two females left in the van at approximately 1528 hours, and the male left at

approximately 1755 hours.

h.      On February 9, 2020, at approximately 1352 hours, what appeared to be the same two females arrived in the same white colored van.  They made approximately 12 trips (total) from the van to the residence with what appeared to be potted marijuana plants.  At approximately 1441 hours, what appeared to be two females arrived with what appeared to be three children, and one adult male.  Everyone left at approximately 1659 hours.

i.      On February 10, 2020, at approximately 1439 hours the same white van arrived with a male that appeared to be BANG.  He made approximately 23 trips from the residence to the van with what appeared to be large black colored trash bags.  After loading the van with the trash bags the male subject left in the van at approximately 1524 hours.

18.     Based on the detailed activity observed at TARGET LOCATION ONE, I believe there is further confirmation that this location is being utilized as a grow location, as well as a processing location.  None of the above noted activity supports this location being utilized as a residence.

19.     Based on his training and experience, I know that subjects involved in the use, distribution, and cultivation of illegal marijuana, are often times in possession of firearms to protect their illegal enterprise and related proceeds from law enforcement or other criminal elements that pose a threat of theft or robbery.  While this is common, there is no specific information regarding this organization or locations that indicate the presence of weapons.

**GPS TRACKERS AT TARGET LOCATIONS**

20.     Pursuant to court orders, Sang BANG and Qiong LIN's white Toyota Sienna minivan (Colorado CFF718) and silver Toyota Sienna minivan (Colorado KQT096) have both been

subject to GPS monitoring.   The white Toyota Sienna was subject to GPS monitoring between July 17, 2019 and August 17, 2019.  During this time, GPS tracking data showed the white Toyota Sienna minivan drove between TARGET LOCATIONS ONE, TWO, THREE and FIVE several times a week.  As noted above in paragraph 11, agents believe the DTO did not acquire TARGET LOCATION FOUR until September 2019.

21.     Between December 2, 2019 and December 12, 2019, both the white and silver Toyota Sienna minivans were subject to additional GPS monitoring.  During that time, GPS data showed both vehicles often traveled between TARGET LOCATIONS ONE, TWO, THREE, FOUR and FIVE.  Documented below are examples of GPS data showing travel between the TARGET LOCATIONS.

22.     On December 2, 2019, around 4:15pm, investigators were conducting surveillance at TARGET LOCATION ONE.  The white Toyota Sienna minivan (Colorado CFF718) was parked in the driveway of TARGET LOCATION ONE and the silver Toyota Sienna minivan (Colorado KQT096) was on the street.

     a.     From the pole camera, CBI Agent Tifft observed a male in a white hat moving unknown items that were not visible from the pole camera from TARGET LOCATION ONE into the white Toyota Sienna minivan.

     b.     Around 4:30pm, Agent Russell installed the GPS tracking device on the Silver Toyota minivan (Colorado KQT096).  While installing the GPS tracker, Agent Russell could smell the odor of fresh marijuana coming from TARGET LOCATION ONE.  Shortly after placing the GPS tracker on the vehicle, three adult Asian females and five children exited TARGET LOCATION ONE and left in the silver Toyota Sienna minivan.  GPS data showed the minivan drove to TARGET LOCATION FIVE.

c.      The male wearing the white hat, exited TARGET LOCATION ONE and left in the white Toyota Sienna minivan (Colorado CFF718).  The white minivan was followed to TARGET LOCATION THREE, where it backed up to the residence.  Agent Russell walked along the sidewalk to an area where he could see over the wall into the driveway of TARGET LOCATION THREE.  Agent Russell observed the male in the white hat unloading what appeared to be potting trays from the minivan and carrying them into TARGET LOCATION THREE.  Three separate trays were moved from the minivan into TARGET LOCATION THREE.  Agent Russell believes these trays were the same items the male loaded into the minivan from TARGET LOCATION ONE. From my training and experience, I know these trays commonly are used to hold juvenile marijuana plants.

d.      The white Toyota Sienna minivan (Colorado CFF718) left TARGET LOCATION THREE and was followed back to TARGET LOCATION FIVE, where a GPS tracker was installed.

23.   On December 4, 2019, GPS Tracker data showed Sang BANG's white Toyota Sienna minivan (Colorado CFF718) had been at TARGET LOCATION FIVE throughout the night.

a.      Around 1:30pm, the white Toyota Sienna minivan left TARGET LOCATION FIVE and drove to TARGET LOCATION TWO.  The minivan only stayed at TARGET LOCATION TWO for a few minutes.

b.      The white Toyota Sienna minivan left TARGET LOCATION TWO and drove to TARGET LOCATION ONE.  The minivan stayed at TARGET LOCATION ONE for approximately 30 minutes.

c.      The white Toyota Sienna minivan left TARGET LOCATION ONE and

drove to TARGET LOCATION FOUR.  The minivan was only at TARGET LOCATION

FOUR for a few minutes before leaving and driving to the Mesa County, Colorado,

Landfill.  After leaving the landfill, the minivan returned to TARGET LOCATION

FOUR.

        d.      When the white Toyota Sienna minivan (Colorado CFF718) left TARGET

LOCATION FOUR, it drove to TARGET LOCATION TWO.  The minivan stayed at

TARGET LOCATION TWO for 40 minutes.

        e.      The white Toyota Sienna minivan (Colorado CFF718) left TARGET

LOCATION TWO and drove back to TARGET LOCATION ONE.  The white minivan

was at TARGET LOCATION ONE for approximately 15 minutes.

        f.      The white Toyota Sienna minivan (Colorado CFF718) left TARGET

LOCATION ONE and drove to another suspected marijuana grow (not listed in this

affidavit) before driving to TARGET LOCATION THREE.  The minivan stayed at

TARGET LOCATION THREE for approximately 15 minutes.

        g.      The white Toyota Sienna minivan (Colorado CFF718) left TARGET

LOCATION THREE and drove again to TARGET LOCATION TWO.  The minivan

stayed at TARGET LOCATION TWO through the night.

        h.      In this incident, I believe the driver of the white Toyota Sienna minivan

(Colorado CFF718) was tending to the marijuana plants at TARGET LOCATIONS ONE,

TWO, THREE, and FOUR.  As documented above, Sang BANG was previously

observed traveling to the Mesa County Landfill where he disposed of bags with cut down

marijuana plants.  In this incident, the minivan traveling between the landfill and

TARGET LOCATION FOUR, was also likely for the purpose of disposing of cut down

marijuana plants.

24.     On December 13, 2019, a review of GPS tracker data showed both the white Toyota

Sienna minivan (Colorado CFF718) and the silver Toyota Sienna minivan (Colorado KQT096)

visited several of the BANG DTO marijuana grows.

      a.     Around 8:52 am, the silver Toyota Sienna minivan (Colorado KQT096)

left TARGET LOCATION FIVE.  The minivan made a brief stop at an elementary

school and then drove to TARGET LOCATION TWO.  The minivan was only at

TARGET LOCATION TWO for a few minutes.

      b.     The silver Toyota Sienna minivan (Colorado KQT096) left TARGET

LOCATION TWO and drove back to TARGET LOCATION FIVE.  The minivan stayed

at TARGET LOCATION FIVE for approximately 3 minutes.

      c.     The silver Toyota Sienna minivan (Colorado KQT096) left TARGET

LOCATION FIVE and drove to Home Depot (2436 F Road, Grand Junction, Colorado).

The minivan was at Home Depot for approximately 10 minutes.

      d.     The silver Toyota minivan (Colorado KQT096) left Home Depot and

drove to TARGET LOCATION THREE.  The minivan stayed at TARGET LOCATION

THREE for 3 minutes.

      e.     At 11:40 am, pole camera footage and GPS data from the white Toyota

Sienna minivan (Colorado CFF718), showed it arriving at TARGET LOCATION ONE.

A male in a white hat, who resembled Sang BANG, parked the minivan outside the gate

and walked into TARGET LOCATION ONE.  The GPS tracker did not record any data

regarding where the minivan had been prior to arriving at TARGET LOCATION ONE.

      f.     The silver Toyota Sienna minivan (Colorado KQT096) left TARGET

LOCATION THREE and drove to TARGET LOCATION ONE.  A review of pole camera footage from 12:14 pm, showed three Asian females walking up the driveway and into the door of TARGET LOCATION ONE.  One of the females was carrying a large object that appeared to be covered with a sheet or bag.  Two of the Asian females immediately left TARGET LOCATION ONE and walked back out to the street, presumable to where the silver minivan was parked out of camera view.

g.      The silver Toyota Sienna minivan (Colorado KQT096) left TARGET LOCATION ONE and drove to another location suspected of being a marijuana grow (not listed in this affidavit).  The GPS tracker showed the minivan returning to TARGET LOCATION ONE.  Pole camera footage showed one Asian female going inside TARGET LOCATION ONE.  Around this time, the GPS tracker on the silver Toyota Sienna minivan stopped functioning.

h.      Based on pole camera footage and GPS tracker data, the white Toyota Sienna minivan (Colorado CFF718) remained at TARGET LOCATION ONE until sometime around 6:50pm.  GPS data showed the minivan drove to TARGET LOCATION TWO, and then later to TARGET LOCATION FIVE.

i.      In this incident, I believe members of the BANG DTO traveled to the marijuana grows at TARGET LOCATION ONE, TWO, and THREE tending to the marijuana plants.  Based on my training and experience, I known marijuana grow supplies and items used to trim and harvest marijuana are commonly purchased at home improvement stores.  The brief stop at Home Depot prior to visiting TARGET LOCATION THREE, was likely to purchase supplies used in the marijuana grow.

25.     Following this incident, the GPS tracker on the white Toyota Sienna minivan (Colorado

CFF718) stopped functioning consistently.  The last recorded location of the minivan was on December 14, 2019, at TARGET LOCATION FOUR.

26.     The GPS data from the white Toyota Sienna minivan (Colorado CFF 718) and the silver Toyota Sienna minivan (Colorado KQT096), support the belief that the TARGET LOCATIONS are either marijuana grows operated by the BANG DTO, or are locations where evidence will likely be found related to violations of Title 21, United States Code, Section 841(a)(1).

a.     From my training and experience, I know it is common for marijuana cultivators to work almost daily in their marijuana grows.  They are often trimming plants, watering, harvesting marijuana or planting new crops.  The GPS data from the white Toyota Sienna minivan (Colorado CFF718) and the silver Toyota Sienna minivan (Colorado KQT096) show these vehicles traveling between the TARGET LOCATIONS on a daily basis.

b.     In addition, I know from training and experience that marijuana cultivators seldom keep finished marijuana product at unoccupied marijuana grow homes.  Finished marijuana product is often taken to locations that do not contain illegal marijuana grows and are less likely to be searched by law enforcement or subject to robbery/theft from other rival criminal groups.  GPS data from the white Toyota Sienna minivan (Colorado CFF718) and the silver Toyota Sienna minivan (Colorado KQT096) show both vehicles spend the night at TARGET LOCATION FIVE, indicating this is BANG's primary residence.   GPS data also shows both minivans commonly travel between marijuana grows and then back to TARGET LOCATION FIVE.  This activity supports that items of evidence will likely be found at TARGET LOCATION FIVE

**SEARCH OF ELECTRONIC MEDIA**

27.     In this affidavit, the terms computers, or digital storage media or devices are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical storage media.

28.     I submit that if computers or storage media are found at the areas described above and in Attachment B, there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  I am aware that modern cellular telephones, or smart phones, operate in many respects as a computer, with internet access, and function at times as a person's computer historically would have.

29.     Based on my and my colleagues' knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

30.     Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in unallocated space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

31.    Also, again based on my training and experience, wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash

storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

32.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how electronic devices were used, the purpose of their use, who used them, and when.

33.     The analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices.  Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

34.     "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at the location described in Attachment A.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35.     I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the locations.

36.     Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

37.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and

completeness of data recorded on the storage media, and to prevent the loss of the data either

from accidental or intentional destruction.  Additionally, to properly examine the storage media

in a controlled environment, it is often necessary that some computer equipment, peripherals,

instructions, and software be seized and examined in the controlled environment.  This is true

because of the following:

      a.     The nature of evidence.  As noted above, not all evidence takes the form

of documents and files that can be easily viewed on site.  Analyzing evidence of how a

computer has been used, what it has been used for, and who has used it requires

considerable time, and taking that much time on premises could be unreasonable.  Also,

because computer evidence is extremely vulnerable to tampering and destruction (both

from external sources and from code embedded in the system as a "booby-trap"), the

controlled environment of a laboratory is essential to its complete and accurate analysis.

      b.     The volume of evidence and time required for an examination.  Storage

media can store the equivalent of millions of pages of information.  Additionally, a

suspect may try to conceal criminal evidence; he or she might store it in random order

with deceptive file names.  This may require searching authorities to peruse all the stored

data to determine which particular files are evidence or instrumentalities of crime.

Analyzing evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises could be

unreasonable.  As explained above, because the warrant calls for forensic electronic

evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage

media to obtain evidence.  Reviewing information for things described in the warrant can

take weeks or months, depending on the volume of data stored, and would be impractical

and invasive to attempt on-site.

        c.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        d.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        e.     Need to review evidence over time and to maintain entirety of evidence.  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each

individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachment A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or

access by persons unrelated to the investigation.

38.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

39.     Because several people may share the area described in this affidavit, it is possible that the area will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

40.     I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size.  Additionally, I know from training and experience that those who are in possession of such devices also tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.  The storage capacity of such devices can be as large as tens of gigabytes in size as further described below, which allows for the storage of thousands of images and videos as well as other digital information such as calendars, contact lists, programs, and text documents.  Such storage devices can be smaller than a postage stamp in size, which allows them to be easily hidden in a person's pocket.

**CONCLUSION**

41.     Based on the above described events, I submit that there is probable cause to believe that the TARGET LOCATIONS listed in Attachment A are being used to manufacture, store, and sell illegal controlled substances in violation of Title 21 U.S.C. § 841(a)(1).

42.     Based on the foregoing, I further submit that there is probable cause to believe that: (1) evidence of such crimes, (2) contraband, fruits of crime, or other items illegally possessed, and (3) property designed for use, intended for use, or used in committing a crime will be located at the **TARGET LOCATIONS**.

43.     WHEREFORE, I respectfully request a search warrant for the TARGET LOCATIONS, including all out buildings, detached garages and vehicles located on the curtilage on the properties.

_s/ Blake McClellan_
Blake McClellan
Task Force Officer
Drug Enforcement Administration

Subscribed, attested to, and acknowledged by reliable electronic means on February _____ 21_____, 2020.

_____
Gordon P. Gallagher
United States Magistrate Judge

**Reviewed and submitted by AUSA Jeremy Chaffin**

ATTACHMENT A
DESCRIPTION OF PROPERTIES TO BE SEARCHED

TARGET LOCATION ONE:  227 Red Mesa Heights Road, Grand Junction, Mesa County,

Colorado, is a single family one story home.   The residence has yellow siding with white trim.

There is a small covered porch and the front door is white in color. The mail box is on the corner

of the driveway and lists "227 Red Mesa Heights" in white lettering.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

Evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) to include:

1. Controlled substances, including, marijuana.

2. Any vessels or other implements used in connection with the production, packaging, weighing, storage, transport, or distribution of such controlled substances.

3. Any substance used to mix into controlled substances in order to create a larger volume. Such substances are commonly referred to as "cut."

4. Items used for the cultivation and processing of marijuana, including marijuana seeds, scissors, drying racks, nutrient reservoirs, PVC/poly pipes, hand or backpack sprayers, watering devices, growing mediums, liquid and powder nutrients, fertilizers, potting soil, pots, fungicides, insecticides, herbicides, pruning shears, irrigation supplies (including tubing, connectors, emitters, etc.), shovels and/or other gardening tools, generators, pumps, and marijuana cultivation manuals.

5. Books, receipts, notes, invoices, charge card and/or credit card statements and summaries, bank statements, records, correspondence, controlled substance customer or supplier lists, growing schedules, logs, journals, contracts, shopping lists for food and supplies, letters, phone records, phone books, address books, notations and other papers, and any files or records relating to the cultivating, transporting, selling, storing, ordering, purchasing or distributing of controlled substances.

6. Indicia related to occupancy, residency or ownership of property, premises, or vehicles, including, purchase or lease agreements, titles, keys, and mail envelopes.

7. Weapons, firearms, and items used in conjunction with weapons or firearms, including magazines, ammunition and means of carrying or concealment and records or receipts pertaining to weapons, firearms and ammunition.

8. Financial records, including expenses incurred in obtaining the equipment and items necessary for the cultivation and/or distribution of controlled substances, income derived from the sales of controlled substances, pay-owe sheets, records of legitimate income (to serve as a baseline to discern excess or unexplained income consistent with proceeds derived from drug trafficking) and general living expenses.

9. United States currency, precious metals, jewelry and financial instruments, including mortgage notes, stocks, and/or bonds representing drug proceeds.

10. Books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, correspondence, safe deposit keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

11. Computers, cellular telephones, and/or portable telephones, pagers, and any stored electronic communications contained therein.

12. Devices used to communicate with other individuals involved in the manufacture and distribution of marijuana or any other controlled substance, including cellular telephones, radios, pagers, beepers and devices used to conduct counter surveillance against law enforcement, including scanners, surveillance cameras, night vision devices, FLIR devices, monitors, motion sensors and/or alarms, recording devices and/or receipts or literature describing the same.

13. Address and/or telephone books (written or typed by hand as opposed to printed commercially), indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

14. Photographs and digital images, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, slides, in particular, photographs of co-conspirators, of assets and/or of controlled substances.

15. Assigned telephone number for any telephone, cell phones and pagers found in the area, along with telephone toll records, papers, notebooks and other items documenting the purchase, acquisition or distribution of marijuana or any other controlled substance, and communications among co-conspirators.

16. For the electronic devices (hereinafter COMPUTERS):

    a. evidence of who used, owned, or controlled the COMPUTERS such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

    b. evidence of software that may allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTERS;

f.  evidence of the times the COMPUTERS were used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

h.  evidence indicating how and when the COMPUTERS were accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the computer user;

i.  contextual information necessary to understand the evidence described in this attachment;

j.  volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

k.  records and information, including texts, emails, photographs, or videos of or about controlled substances or people possessing, obtaining, distributing, or using controlled substances or holding firearms;

l.  records of or information about the COMPUTERS' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  information, notes, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Sections 841(a)(1).

n.  items otherwise described in this attachment but contained on an electronic device of any sort.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

DEFINITIONS:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as film, prints, videos, or photocopies).

As used above, the terms "computers" or "digital storage media" are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, network hardware, hard disks, RAM, flash memory, and other electronic storage media.